Our next case on the call to DACA today is 111127, City of Chicago, Appellant v. Stubhub!, Agenda No. 11. Counsel for the appellant. May it please the Court, I'm Julian Henricus. I represent the City of Chicago. The City's amusement tax helps pay the substantial services that the City provides for the venues in Chicago at which sporting events, theater productions, concerts, and other amusements are held. Such City services include police and fire protection, emergency response, and building inspections. The City's ordinance taxes the admission fees or other charges paid for the privilege to attend amusements in Chicago. The ordinance imposes the tax on the persons who pay for that privilege while requiring that the tax be collected from such persons and remitted to the City by various other persons and entities, including the owners and operators of the amusements, as well as every reseller of tickets and every reseller's agent. This morning I'll explain first that the City has authority under Illinois law to tax payments for the privilege to attend amusements, including ticket sales and resales. Second, that the City also has authority under Illinois law to require reseller's agents to collect and remit the tax from those required to pay it. And third, that Stubhub! is a reseller's agent as defined in the City's amusement tax ordinance and thus is among the persons and entities that the ordinance lawfully requires to collect and remit the tax. What about the Ticket Act? Yes, the Ticket Act is in a criminal law provision, concerns only ticket scalping, and addresses only the connection between ticket collections and ticket scalping. It has no bearing at all on anything other than ticket scalping. 1.5c says this act does not apply to the sale of tickets, of admission to a sporting event, theater, musical performance, and so on. Does 1.5c not apply? No, it certainly applies. The act, for a long time in Illinois, ticket scalping was unlawful. And this section 1.5 of this provision of the statutes amended the statute to allow what used to be ticket scalping. It amended the statute to allow the resale of tickets at amounts higher than the face amount of the tickets under certain circumstances. One of those circumstances concerns internet auction listing services, the subsection c of the statute that your honor is addressing. That provision allows tickets to be sold at higher than their face value provided that they're sold on an internet auction listing service website and meet various requirements. But those requirements, again, only concern the circumstances under which the sale would or would not violate ticket scalping. The statute doesn't even purport to address situations outside of ticket scalping. They do not excuse an internet auction listing service or a seller from, excuse me, an internet auction listing service from any requirement to collect a tax for any purpose other than whether ticket scalping is, whether or not there's an unlawful ticket scalp. One of those requirements that you indicate correctly is set forth in 1.5 C6. And that section states the operator either A, complies with all applicable requirements of the Retailer Occupation Tax Act and collects and remits all applicable federal, state, and local taxes. Or B, publishes a written notice on the website after the sale of one or more tickets that automatically informs the ticket reseller of the ticket reseller's potential legal obligation to pay any applicable local amusement tax in connection with the reseller's sale of tickets. So what is the import of C6, if any? Yes, that option only sets forth a circumstance where if an internet auction listing service complies with either one of those options, then the transaction is not an unlawful ticket scalp. No one violates the criminal law of ticket scalping. But that section doesn't even purport to excuse the collection of a tax for purposes that is required by some other statute or ordinance. The only import of the section is for purposes of ticket scalping. Now, I'd like also to mention here that the key question, one of the key questions in this case is whether the city has home rule authority for its tax. We explain in our briefs that we do have home rule authority for our tax. Because we do have home rule authority, in order to excuse the collection of any tax, this statute or some other statute would have to expressly preempt our authority to require an internet auction listing service to collect the tax. There would have to be express language saying, from the General Assembly, saying that the tax requirement is that municipalities are prohibited, that we expressly preempt the authority of municipalities to collect the tax. This statute doesn't contain that kind of preemption, the required preemption language. So even if the language of the statute were in tension with a collection requirement, the city's ordinance would prevail over the language of the ordinance under the standard requirements, the standards that apply to home rule authority. Stubhub argues that cases say that it's not necessary to have language in the statute to expressly preempt, that there are other elements that the court can look to to determine whether or not the legislature structured this to be a statewide policy. In fact, they direct us extensively to legislative debate on this statute to argue that that, in fact, was the intention of the legislature. Why shouldn't we look at those debates where the legislators seem to be implying that this was meant to be a statewide provision? Well, there are many statewide provisions. To the effect that it would preempt the home rule authority. Well, to use our language, there are basically two requirements that a home rule municipality must satisfy in order to enact a home rule provision that complies with the Constitution. One of those is that it must be within the government and affairs of the home rule unit. The other one is that the matter is not expressly preempted by the General Assembly. There is no expressed preemption language in this statute that would preempt our authority to collect. And by the way, this section, the amendment that added this subsection C to the statute only passed the Illinois Senate by, it did not have passed the Illinois Senate by the 60% that is required in order to have preemption. So there's no surprise that the statute lacks preemption language. But to address your question, which I interpret to mean that the question is whether or not the ordinance is within the city's government and affairs, which is necessary for home rule, they argue, among other things, that there's extraterritorial reach, that our ordinance has extraterritorial reach because parties who purchase or sell tickets might both be outside of the city of Chicago. We think that that is answered and rejected by this court's decision in Mulligan v. Dunn in the Illinois Appellate Court's decision following that decision in the Illinois Wine and Spirits case in which the court held that distributors of liquor that do business that are located outside of the county that's doing the taxing may nevertheless be required to collect a home rule liquor tax if they're doing business with retailers in the municipality. We think that our situation is perfectly analogous here. Every single venue that are subject to our tax are in the city of Chicago. We don't tax ticket sales or the payments for the privilege to attend any amusements that are anywhere other than in the city of Chicago. So if two people outside of the city of Chicago contract to purchase a ticket or sell a ticket, then the ticket is a license for attendance at an amusement event that occurs in the city of Chicago. So there's no extraterritorial reach of the statute. The statute always pertains only to tickets and only to tickets that occur in venues that are in Chicago. Now the other requirement that StubHub mentions, the other aspect of government and affairs, whether or not our ordinance is within the city's government and affairs, the other aspect of that is whether the matter is considered of statewide concern. And obviously the state has some concern here. They did enact a statute that regulates Internet auction listing services. They also have this provision, the subsection C in the Ticket Sale and Resale Act. But that's not the end of the matter. When two different units of government both have an interest in a subject, in a particular problem, the question then becomes a three-part test that we set out in our brief. And it's what is the extent and nature of the problem? Who has the most vital interest in the problem? And which entity has traditionally been involved most in the solution to the problem? In this case, we've got two different, the problem is sort of dual faceted. One is revenue for a municipality. The other one is, the other facet is what about ticket sales, Internet auction listing services? Well, with respect to municipal revenue, the city obviously has the primary interest in that matter. It has far more interest than the state in the matter. It's the city's direct revenues that are at stake. With respect to the regulation of Internet auction listing services, the state has an interest, but the city has an interest as well. There's no predominant interest with respect to who has, with respect to regulation of Internet auction listing services. The, and obviously municipal revenue is absolutely essential to, it's the lifeblood of municipalities. Without revenue, we can't function at all. So taxes like this amusement tax, which are the least regressive taxes around, are important sources of income for the city of Chicago and for other home rule municipalities. And there's no traditional role. I mean, we've got a very recent advent of the Internet, and we've got even more recent enactments in the Ticket Sale and Resale Act that pertain to Internet auction listing services. So far, it would be improper, I think, to conclude that there is any traditional regulation. It's just too brief a time to talk about anything that's traditional. On the other hand, the regulation of, or the taxation, municipal taxation, is as old as there have been municipalities. I mentioned earlier that the city has authority to enact the tax. It also has authority to collect the tax. With respect to the enactment of the tax, the city has authority under three separate sources of Illinois law, the home rule provision and two statutes as well. If the court were to conclude that we don't have home rule authority, then we have two statutes that authorize the tax in addition to the home rule provision. We discuss those in the, in our brief. We've talked about preemption, which is one of the requirements, one of the ways in which home rule authority can be denied or rejected or defeated. The General Assembly, by a vote of 60 percent, could enact a statute. I mentioned that it could enact a provision that preempts the authority of home rules to tax. I've mentioned that there is no such statute in Illinois. Nothing preempts the authority of the city to collect tax, to require Internet auction listing services to collect the tax. Another requirement would be, another prohibition would be, the city cannot enact occupation taxes. StubHub has argued in its brief that our tax is an unlawful occupation tax. But the cases of this court are absolutely clear that this is not an unlawful occupation tax. It's not an unlawful occupation tax because the delegates of the Constitutional Convention, by consensus, expressed favor with taxes on amusements. And this court has developed two tests to determine whether taxes are unlawful occupation taxes or home rule taxes. The test that applies here is the express declaration test. When the, this court has decided that when at the Constitutional Convention the delegates favored a tax, such as the, one of which was amusement taxes, it's a lawful tax as long as the legal incidence is on the purchaser and not on the seller. It's not an occupation tax if the legal incidence is on the purchaser, not the seller. So it's not on the occupation. Here, our ordinance expressly declares that the legal incidence is on the purchaser, not the seller. So it's not an unlawful occupation tax. We also have home rule authority to collect the tax from other entities. When we have a tax and it's impractical to collect the tax from the purchaser on whom we place the legal incidence, we have authority to collect the tax from other entities. And we have home rule authority to do that. In fact, we would have home rule authority to do that even if we didn't have home rule authority to impose the tax. Because the home rule provision is broader than the power to tax. We have authority under home rule to perform any function within our government and affairs, not just the power to tax. So as long as we have authority, even pursuant to statute, to impose the tax, we also have authority pursuant to home rule to require appropriate entities to collect the tax. Do people who sell through Craigslist, are they subject to the tax, or is Craigslist subject to the tax? At this point, I'm unaware of what relationship StubHub has. We don't, excuse me, Craigslist, we don't have any case at this point against StubHub. I understand that there's a different model that StubHub follows, and its participation with respect to the tax is not nearly as great a participation in the assistance and representation or activity on behalf of the seller as StubHub is. But so at this point, I'd rather not discuss exactly what the function of StubHub is, except only to acknowledge that it's a different model. I believe the Seventh Circuit thought that they were not subject to the tax, and I didn't think you had an issue with that. The Seventh Circuit certainly expressed that view, and at this point we certainly have never taken a contrary view, but we haven't been required to at this point. Now, we also explain that under our ordinance, StubHub is a reseller's agent, as we define it in the ordinance. StubHub focuses on the word agent in the name reseller's agent. We have a definition, we define that term, and our definition does not include the word agent or any variation of agent. StubHub is an agent. We explain in our brief that StubHub is a reseller's agent within our definition. I'll reserve the rest of my time. Thank you. Counsel for the appellee. May it please the Court, Tim Bishop for StubHub. This case is not, despite what you have heard, about Chicago's ability to collect tax revenue. Chicago can collect amusement tax that it's owed on ticket resales that occur through StubHub's website directly from the reseller, and the Ticket Act facilitates precisely that. First of all, the Ticket Act says that StubHub has to notify users of the website of potential local tax obligations. Second, the Ticket Act provides that upon request and without subpoena, StubHub has to supply the city with information about ticket buyers, ticket resellers, and their transactions on the website. StubHub cooperates with other cities around the nation in supplying such information. The General Assembly provided the city in the Ticket Act with the tools that it needs to collect the revenue. Chicago has readily within its grasp the information that it needs to collect the amusement tax from those who have not paid it voluntarily, and it can impose penalties on those who do not comply. Rather than litigating this case for years, Chicago could have been collecting the tax, as the General Assembly assumed that it would. The Ticket Act sponsors anticipated that Chicago's tax revenue would increase as a result of this scheme in the Ticket Act, and that's because ticket transactions, rather than occurring as they did before the Act in a totally unregulated environment in which tax collection was extremely difficult, would now occur on state-regulated Internet auction listing sites. Mr. Bishop, I have a question. In Mr. B's case, do you agree that these tickets are tangible property? There are several older cases that the tickets really are licensed to enter a particular event, and whether they are sold in the first instance or resold. We think as an alternative ground for the decision here that the District Court did get it right, and that Mr. B's got it right, that tickets at resale are tangible personal property. We think that the two arguments that we would like this course to focus on are the Article 7, Section 6A question of whether or not the issue here is one that has been marked out as one of vital state concern by the General Assembly through the Ticket Act, and then second, an alternative argument that these tickets are tangible personal property. Now, these tickets, we're talking about tickets at resale. There's no doubt this Court has held that tickets sold by the operator of a venue are included in addition to the ticket itself, that what's being sold is a license. We are one or two steps removed from that. We are the operator of a marketplace in which people resell the tickets. All those resellers have, they are not the operators of the venue, they have no control over the seat license. All they have to sell is the ticket itself. But the ticket, the meaning behind the ticket is actually a permission to go to an event. Behind the ticket there is an intangible license, yes, but that was true in Exxon and it was true in Foran, where this Court found the coal and the electrons to be tangible personal property, despite the fact that there's the intangible energy behind it. I don't think it's a strange concept to think that it's both, but the property is a bundle of rights and the tickets represent both a seat license and the piece of paper that you have to present to the venue to get into the venue. But imagine you buy a ticket, you go to the venue and someone is sitting in your seat. That is not a problem for the ticket reseller that you bought the ticket from, because they have no control over the seat. It's a problem for the venue. They have to deal with the terms of the license. On the other hand, if the ticket is fake, then it's the reseller who has the problem and not the venue, the person that you brought it from. There's another example of the difference between the seat license and the ticket and how during the resale process one becomes more dominant, the ticket itself becomes more dominant. Chicago taxes each resale, regardless of whether or not the person who buys the ticket actually goes to the event. The focus of the transaction at resale is the ticket rather than the seat license. And just let me say that this is what Chicago told the appellate court in Mr. B's. And this is a quote. The value of the transaction, Mr. B's involved resales by a broker. So the broker owned the ticket, but these were resales and not sales by the original operator of the venue. The value of the transaction at resale, quote, is that it culminates in the transfer of a tangible item. Quote, without tickets, the brokers would have nothing to sell. The citizen amusement tax is therefore a tax on the tangible item of personal property, the ticket that they sell. That's a quote from Chicago's brief in Mr. B's signed by city council who's sitting here today. If I can turn from the tangible personal property back to... But why should you be treated differently than brokers? Because we do not, we provide a marketplace for owners of tickets to sell them to buyers. We do not own the ticket. And that is the difference, key difference in the business model that was pointed out in the legislative history of the Ticket Act. And in fact... There's little probability that the, or chance that the ticket owner or the seller will comply with the tax? No. As I explained to begin with, Justice Berkley, the general assembly gave the city the way to get the tax. They said that we, upon city's request, have to supply the city with specific information about transactions, about the seller, identifying information about the seller, about the buyer, and about the transaction. We work with cities all over the country in supplying this sort of information. The city can send a letter. I mean, they haven't talked to us about what information they want or how this would work, but I see no difficulty whatsoever in the city sending a demand letter to a seller from the website saying, you owe us money on these transactions. If they don't comply, the city has penalties that they can impose. It seems to me that if the city were to do this, rather than spending its time litigating this issue that the general assembly has already decided, if they were to do this, that users of the websites would soon get the message, if we don't get this tax paid, we are going to have compliance issues. We're going to end up paying penalties. We better send a check when we get the notice from StubHub, which we supply. Upon the transaction, we send them a notice on the website saying, you have to talk to the city of Chicago. There are local tax obligations. And for enforcement, we can supply the information to the city. So it's simply not the case when the city comes here saying, oh, we can't get this revenue. We need the revenue. The general assembly specifically thought about that issue, and they gave us the option not to pay the tax and instead to do what we have chosen to do, which is to provide a notice to users of the website of their tax obligations to the city and to supply information on request when the city asks for it. So the general assembly, as I said, gave the city the tools that they need to collect the tax. They've chosen not to do it.  The statute says that brokers do have to collect and remit the local taxes they have. They are owners of the ticket. It's not difficult for them to do. But it treats differently state-registered Internet option listing sites like StubHub, which provide a marketplace on which others can carry out transactions. They give us the option, the option either to collect or instead to notify and to supply information. And that is a carefully crafted option that the city purports to take away. And, you know, this court has said that it has already been discussed that under Article 7, Section 6A, that the city's power is limited to its own affairs and government. And it's our position that this carefully reticulated regulatory scheme set forth in the Ticket Act makes the issue of Internet option listing site regulation a matter of vital state interest. And here's why. Here's why the General Assembly thought that. I mean, I think it's laid out very clearly in the legislative history what the General Assembly's thinking was here and why they thought that ticket brokers were different from Internet option listing sites. But the Internet is not bounded by political borders. Entry and exit from this business is very easy. Regulation of this new medium is hard. So the General Assembly wanted to corral the ticket business, which had previously been operating in the Wild West, corral the ticket business on the Internet to provide a regulated environment in which consumers could safely transact business and benefit from consumer protections like refunds for canceled events or for fraudulent tickets. They wanted to encourage web-based platforms to register as Internet option listing sites and thereby subject themselves to maintaining business standards that are dictated by the state. And part of that scheme, an integral part of that scheme, is that the General Assembly gave IALS the option not to pay the tax but instead to cooperate with local tax authorities so that they could collect the tax. That is a statewide approach to the regulation of the online ticket business, which is a statewide issue. Register as an Internet option listing site, this legislative bargain goes, thereby agree to a considerable degree of state regulation, and then you can conduct your business free of ticket scalping restrictions and you can choose whether to collect amusement taxes. And that bargain is at the heart of the General Assembly's scheme to regulate Internet ticket resales. And it's not as if the city was silent during the passage of this act. In fact, it wasn't a bystander. When the Ticket Act was adopted, the city was a central participant in the negotiations over what the act would look like. And some senators supported an amendment that would have required Internet listing services like StubHub to collect the tax, the city tax, just like brokers. But that proposal was defeated. And it wasn't defeated in the way that just suggests, oh, well, they didn't bother with that amendment because that was something the statute already did. No, it was defeated because, as the Chief Senate Sponsor, Senator Harman, said, that amendment will kill the bill. It will kill the bill because it doesn't recognize the distinction, the fundamental business distinction between ticket brokers who own the tickets and Internet auction listing sites that provide a web platform for others to sell the tickets. And so the city did not object to the final bill as it was passed because its negotiators understood that the General Assembly had given Chicago a means to collect from resellers. And here is what House Sponsor, the Chief House Sponsor, Representative Saviano, said in the Committee on Consumer Protection. And this is quoted in our brief at page 25. The agreement, quote, the agreement we made with the city of Chicago is that it will collect the taxes from the sellers of those tickets. The agreement we made with the city of Chicago is that it will collect the taxes from the sellers of those tickets. Having negotiated for six months over the statute, having told legislators that it will collect the tax from resellers, Chicago should not now be able to renege on that deal, litigating its way to the very amendment that the General Assembly rejected because it was incompatible with the bill and that the city at that time did not even support. Mr. Bishop, is all of this legislative history reference in the record? Well, this case was decided on a motion to dismiss. I know, but the points you just argued, is it in the record? Yes, I mean, it's in our appendix. It was accepted by the Seventh Circuit. And in terms of looking at legislative history, are you saying the statute is ambiguous and that's why we need to look at it? No, not at all. I don't think the statute is ambiguous. I think that 1.5C is absolutely plain on its face. It gives us an option. And for the city to take away that option is flatly incompatible with what the General Assembly decided. What I think the legislative history is useful for is just in this is a new business. The Internet business is new. I mean, there's ticket brokers here. There's the IALS. I think what the legislative history is useful for is just explaining what the General Assembly's thinking was here. And why they considered this regulatory scheme and this provision giving us the option important. What the legislative history shows is the context, if you like. The General Assembly wanted to regulate this new business that carried a lot of risk for consumers. And so it set up a regulatory scheme. It said, we will set you free of the criminal restrictions on resales of tickets above face value, but only if you register as an Internet option listing site, which is another statute that's in our appendix. It carries a lot of provisions, things that we have to do. And then the Ticket Act itself sets out another set of regulatory requirements that are all consumer-oriented. And Representative Saviano, we quote a page. My learned friend insists this is just a criminal statute, but on page 29 of our brief, we cite cases that say that a criminal statute can be, in essence, regulatory. And Representative Saviano, we quote there, is saying this is a regulatory statute intended for consumer protection. The way that the General Assembly got the consumer protections was by saying you can conduct this business free of the criminal law, but you have to agree to all of these regulatory requirements to bring competition into the ticket market so the brokers no longer have their monopoly. And that you can, and you have to provide these protections against fraud or cancellation. So I think the utility of that legislative history, and the utility of the fact that the amendment that would have put us on the same footing with regard to collecting the taxes as the brokers, that that was defeated, and it was defeated with the explanation from Senator Harman that this was utterly incompatible with the regulatory scheme of the bill. The importance of that is I think you could decide this case in our favor based on the plain language of 1.5C without looking at that legislative history. I think when you do look at the legislative history, it makes absolutely plain why, in this context, this is a matter of intense state interest, a vital interest to the state. If you pull out from this scheme the option, you have taken away the incentive that the General Assembly understood was necessary to have folks register as Internet auction listing sites and submit themselves to this very intensive degree of regulation. That was part of the legislative bargain. So for the city to come along now years after the legislation was passed and say, oh, no, you have to collect the tax, is incredibly destructive of the vital state interest here. And just let me mention that the 6A case that I think is like this, where if you pull something out of the statutory scheme, the whole thing collapses. It doesn't work anymore, is the Bernardi case, which is cited in our brief. And Highland Park there, you'll remember, tried to legislate its way out of the state's prevailing wage act for local public works projects. Clearly, there's a local interest here. The local interest is we're going to spend less money on local public works because we won't pay the minimum wage. This court said, no, you can't do that. This is a balanced and carefully crafted economic scheme, statewide scheme. And the effect of allowing home rule opt-outs of that would be, quote, a chaotic and ultimately ineffective state labor policy. That would be the impact here of allowing Chicago to collect. It would destroy the regulatory scheme and the set of incentives that are included there. Another case like that is LaSalle against Mattawa, where a legislative scheme of rights and obligations prescribed a method for obtaining disconnection from a municipality. Of course, a municipality has an intense interest in whether parts of the municipality can disconnect, and its tax revenue therefore go down. And so the city of Mattawa had put another set of procedural requirements on top of the ones laid down by the statute. This court said, no, you can't do that. This is a matter of vital state concern with which the city cannot interfere. And there are plenty of tax cases decided under 6A where this court has also said that the home rule power is lacking. I draw your attention to AT&T against Arlington Heights, where this court denied under 6A home rule authority to tax fiber optic cable laid through a municipality because that was an issue of statewide concern. Bridgeman against Causen, which is where Cook County tried to collect its property taxes on a quarterly basis instead of semi-annually, as was provided by the statute. And finally, if I can just mention Ampersand against Finley, which is another tax case where this court used 6A to strike down a municipal ordinance. Thank you. Thank you, Mr. Bishop. It's simple why we don't pursue each reseller of tickets on the website. There are thousands and thousands and thousands of them. Most of them are only people who sell one set of tickets once in a blue moon. We couldn't possibly expend city resources going after those people. The reason that the city did not oppose the enactment of this ordinance, this statute, the Ticket Sale and Resale Act, was because we didn't have to. It was not preempted. It includes no preemption language. It was not preempted by the General Assembly in the way that this court's cases have explained a municipal authority must be preempted. Also, Section 7 of the Statute on Statutes embodies this court's decisions on the method for preempting municipal home rule authority, and it requires specific language saying that home rule authority is preempted. There is no language in the Ticket Sale and Resale Act. We had no reason to object to that statute because it doesn't include that language. And the statute, by the way, barely passed. It didn't pass by the 60 percent that was necessary even if it had included that language. Moreover, as I mentioned at the outset of my initial remarks in response to Judge Thomas's question, this statute, the Ticket Sale and Resale Act, by its express language, plain language, only addresses the circumstances under which the offense of ticket scalping is committed. Nothing that the General Assembly can say about we intend this to be a regulatory measure matters. Its plain language specifically says only that these are the circumstances under which the offense of ticket scalping is and is not committed. So when an Internet auction listing service ends up not collecting taxes but posting the warning that is the other alternative, all it means is that the statute, the criminal violation didn't occur. It doesn't address at all, it doesn't excuse at all a municipality or the state from sanctioning the failure to collect. We can, we still have the right to insist on collection even though the absence of collection means that there's no violation of the criminal law of ticket scalping. That's all that it means. So all the discussion that StubHub has presented concerning and reliance on the Ticket Act is completely beside the point. There was some discussion of tangible personal property. But a ticket, as Justice Burke mentioned, conveys a license to attend an amusement. And it conveys that license whether it's purchased initially from the venue itself or whether it's transferred from one seller to another. Every time it's sold, the purchaser purchases from the seller the ticket license. It's true that it will ultimately, only one person will attend and actually exercise that license. But each time it's sold, a person gains the value of that license. The council mentioned various cases including the AT&T case, including the Bernardi case involving Highland Park's overriding, attempt to override the prevailing wage act. Those have extraterritorial effect. Both of those cases concern extraterritoriality. In the Bernardi case, the prevailing wage act sets out a complex formula for determining what wages are in public works projects in a broader area than a municipality. So that any time that a municipality overrides it, it changes the equation that affects public works projects outside the municipality. That's not our case. We have no effect. Our ordinance does not affect at all anything that occurs outside of the statute. AT&T, the fiber optic cable, this court specifically concluded that the fiber optic cable did not affect at all any of the municipalities through which the cable ran. In other words, there was negligible effect, if any, on those municipalities. So that there was no, it fell outside the government and affairs of those municipalities to try to collect any amount as a fee for running the fiber optic cable through the municipalities. If there are no further questions, we ask the court to decide the certified, the question that the Seventh Circuit certified to it, which is whether electronic intermediaries may require Internet auction listing services to collect a certain amount of money. So that's our case. Thank you. Case number 111-127, City of Chicago Appellant v. StubHub. Mr. Marshall, the Illinois Supreme Court will stand in recess until 1140 a.m.